**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 21, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

STATE OF OKLAHOMA, ex rel.
W.A. DREW EDMONDSON, in his
capacity as ATTORNEY GENERAL
OF THE STATE OF OKLAHOMA
and OKLAHOMA SECRETARY OF
THE OFFICE OF ENVIRONMENT
J.D. STRONG in his capacity as the
TRUSTEE FOR NATURAL
RESOURCES FOR THE STATE OF
OKLAHOMA,

        Plaintiffs - Appellees,

v.

TYSON FOODS, INC.; TYSON
POULTRY, INC.; TYSON CHICKEN,
INC.; COBB-VANTRESS, INC.;
GEORGE'S, INC.; GEORGE'S
FARMS, INC.; PETERSON FARMS,
INC.; SIMMONS FOODS, INC.;
CAL-MAINE FARMS, INC.; CAL-
MAINE FOODS, INC.; CARGILL,
INC.; CARGILL TURKEY
PRODUCTION, LLC,

        Defendants - Appellees,

_____

CHEROKEE NATION,

        Movant - Appellant.

No. 09-5134

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 4:05-CV-00329-GKF-PJC)**

A. Diane Hammons, Attorney General, (Sara E. Hill, Assistant Attorney General, with her on the briefs), Cherokee Nation, Tahlequah, Oklahoma, for Movant - Appellant.

Jay T. Jorgensen, Sidley Austin LLP, Washington, D.C., (Virginia A. Seitz, Thomas C. Green, Mark D. Hopson, Sidley Austin LLP, Washington, D.C.; Robert W. George, Vice President and Associate General Counsel, Bryan Burns, Timothy T. Jones, Tyson Foods, Inc., Springdale, Arkansas; Michael R. Bond, Kutak Rock LLP, Fayetteville, Arkansas, with him on the briefs for Defendants - Appellees Tyson Foods, Inc., Tyson, Poultry, Inc., Tyson Chicken, Inc., and Cobb-Vantress, Inc.) (Gary V. Weeks, Woodson W. Bassett III, James M. Graves, Vince Chadick, K.C. Dupps Tucker, Bassett Law Firm, Fayetteville, Arkansas; Randall E. Rose, George W. Owens, Owens Law Firm, P.C., Tulsa, Oklahoma, with him on the briefs for Defendants - Appellees, George's, Inc. and George's Farms, Inc.) (Robert P. Redemann, Perrine, McGivern, Redemann, Reid, Berry & Taylor, P.L.L.C., Tulsa, Oklahoma; Robert E. Sanders, Young Williams, P.A., Jackson, Mississippi, with him on the briefs for Defendants - Appellees Cal-Maine Farms, Inc. and Cal-Maine Foods, Inc.) (John H. Tucker, Theresa Noble Hill, Rhodes, Hieronymus, Jones, Tucker & Gable, PLLC, Tulsa, Oklahoma; Delmar R. Ehrich, Bruce Jones, Krisann C. Kleibacker Lee, Faegre & Benson LLP, Minneapolis, Minnesota, with him on the briefs for Defendants - Appellees Cargill, Inc. and Cargill Turkey Production, Inc.) (John R. Elrod, Vicki Bronson, Conner & Winters, L.L.P., Fayetteville, Arkansas, with him on the briefs for Defendant - Appellee Simmons Foods, Inc.) (A. Scott McDaniel, Nicole M. Longwell, Philip D. Hixon, McDaniel Hixon Longwell & Acord, PLLC, Tulsa, Oklahoma, with him on the briefs for Defendant - Appellee Peterson Farms, Inc.), for Defendants - Appellees.

Ingrid L. Moll, Motley Rice LLC, Hartford, Connecticut, (Frederick C. Baker, Motley Rice, LLC, Mount Pleasant, South Carolina; Louis W. Bullock, Robert M. Blakemore, Bullock Bullock & Blakemore PLLC, Tulsa, Oklahoma; M. David Riggs, Richard T. Garren, Robert A. Nance, David P. Page, Sharon Gentry, Riggs, Abney, Neal, Turpen, Orbison & Lewis, Tulsa, Oklahoma, with her on the briefs), for Plaintiff - Appellee.

Before **TACHA**, **EBEL**, and **HARTZ**, Circuit Judges.

**HARTZ**, Circuit Judge.

The Cherokee Nation (the Nation) appeals the district court's denial of its motion to intervene in a dispute between the State of Oklahoma (the State) and Defendants-Appellees (collectively, Tyson). The State had sued Tyson because of Tyson's disposal of poultry waste in the Illinois River Watershed (IRW). The IRW, in which both the State and the Nation claim interests, covers approximately one million acres straddling the Oklahoma-Arkansas border. Within it are hundreds of large-scale poultry farms. Tyson operates some of these farms and contracts with other farmers to raise poultry until maturity, using methods established by Tyson; Tyson collects the poultry at maturity for processing and marketing. These poultry-growing operations generate hundreds of thousands of tons of poultry waste each year.

Raising a number of legal theories, the State sought monetary relief for past and future damages and an injunction against alleged pollution. More than three years into the litigation, Tyson moved to dismiss the monetary claims on the ground that the Nation was a required party that had not been joined. The State argued that the Nation was not a required party but also negotiated an agreement in which the Nation purportedly assigned the State its interests in the litigation.

The district court ruled that the agreement was invalid and granted Tyson's motion, restricting the previously scheduled trial to the State's claims for injunctive and other equitable relief.

Nineteen days before trial the Nation moved to intervene so that it could proceed on three claims against Tyson for injunctive and monetary relief. The district court denied the motion as untimely. Although the Nation argued that it had moved promptly after learning that the State could not adequately represent the Nation's interests in the litigation, the district court ruled that the Nation had delayed too long, that Tyson would be severely prejudiced by the lengthy trial delay that would be necessary if the Nation were permitted to intervene, and that the Nation would not be prejudiced by a denial of intervention.

We have jurisdiction under 28 U.S.C. § 1291, *see WildEarth Guardians v. U.S. Forest Service*, 573 F.3d 992, 994 (10th Cir. 2009) (order denying intervention was final), and affirm. The district court did not abuse its discretion in denying the motion to intervene. In particular, the district court could properly find that the Nation had unduly delayed seeking to intervene because from the outset of the litigation it had no reason to believe that the State would represent its interests in monetary relief.

## I.    BACKGROUND

### A.    Early Stages of the Litigation

On June 13, 2005, the State sued Tyson in the United States District Court for the Northern District of Oklahoma. According to the initial complaint, Tyson and the individual poultry farmers improperly disposed of poultry waste by both storing it and using it as fertilizer on lands within the IRW. Because the waste contains high levels of certain chemicals and microbes that are harmful to the environment and human health, these disposal practices allegedly result in injury to the lands, waters, and biota of the IRW. The complaint further alleged that Tyson is responsible for these disposal practices and thus the resultant injury to the IRW.

The State brought suit as owner of the streams and rivers of the IRW, as holder of all natural resources within the State's boundaries "in trust on behalf of and for the benefit of the public," Complaint at 3, *State of Oklahoma v. Tyson Foods, Inc.*, No. 05-cv-0329 JOE-SAJ (N.D. Okla. June 13, 2005), and as trustee under the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) for natural resources within Oklahoma. The initial complaint stated nine causes of action. Two causes of action were under CERCLA, 42 U.S.C. § 9607. The first CERCLA claim sought recovery of costs (such as the costs of monitoring and evaluating water quality and biota in the IRW) incurred by the State in responding to Tyson's disposal practices, as well as a declaration that Tyson is responsible for all future response costs that the State would incur. In the second CERCLA claim the State—acting as "CERCLA

trustee for 'natural resources' in, belonging to, managed by, held in trust by, appertaining to or otherwise controlled by" the State—sought damages for injury to and loss of natural resources, including the cost of restoring or replacing the injured resources, the value of lost services resulting from the injury to the resources, and the reasonable cost of assessing injury to the resources. *Id.* at 21. The State's third and fourth claims were based on state and federal nuisance law. They alleged that Tyson's disposal practices unreasonably "inva[ded,] interfere[d] with and impair[ed]" the State's and the public's beneficial use of the IRW, and sought damages (including punitive damages) and an injunction requiring Tyson to cease its disposal methods and remediate the IRW. *Id.* at 24. The fifth claim sought damages and injunctive relief for trespass on the State's property interests in the IRW. The State's sixth and seventh claims sought civil penalties and injunctive relief for violations of the Oklahoma Environmental Quality Code, *see* Okla. Stat. tit. 27A, §§ 2-6-105, 2-3-504; the Oklahoma Agricultural Code, *see* Okla. Stat. tit. 2, §§ 2-16, 2-18.1; the Oklahoma Registered Poultry Feeding Operations Act, *see* Okla. Stat. tit. 2, §§ 10-9.7, 10.9-11; and certain provisions of the Oklahoma Administrative Code, *see* Okla. Admin. Code § 35:17-5-5. The State's eighth claim was for unjust enrichment, seeking restitution and

disgorgement of profits from the alleged improper waste disposal.  A ninth claim

was later voluntarily dismissed with prejudice.[1]

The complaint did not mention the Nation.  But the Nation was aware of

the litigation from the outset.  In March 2005, when alerted to the State's

intention to file suit, Chad Smith, Principal Chief of the Nation, wrote the

following in a letter to Oklahoma's Attorney General:

> I've had the opportunity to meet with a number of poultry growers in
> Delaware County, a quarter of whom are Cherokee.  They are
> concerned that the proposed lawsuit would, in effect, put them out of
> business.  I advised them that I would contact your office and offer
> our assistance and services in any way that might be helpful to
> facilitate discussions to reconcile the poultry litter problem affecting
> water quality in Northeastern Oklahoma.

Aplt. App., Vol. 4 at 688.

This letter reflected the Nation's obvious interest in the subject matter of

the lawsuit.  Much of the IRW is within the boundaries of the Cherokee Nation

and, as clearly emerged later in the lawsuit, the Nation claims that various federal

laws and treaties have given it ownership and control over lands, waters, and

natural resources of the IRW since before Oklahoma statehood.  Yet despite these

claims regarding the IRW, nothing in the record indicates that before 2009 the

Nation ever expressed to the State (much less reached an agreement with the

---

[1]The complaint was later amended on two occasions.  The first amended
complaint added a count seeking civil penalties and injunctive relief under the
Resource Conservation and Recovery Act, 42 U.S.C. § 6972.  The second
amended complaint, filed July 16, 2007, dropped a defendant.  The changes from
the original complaint are irrelevant to the issues on appeal.

State) that it should share in the State's recovery of costs or damages in its lawsuit.

The Nation was, however, engaged early on with both the State and Tyson. In late 2005, after the filing of the initial complaint, representatives of the Nation met with representatives of both Tyson and the State. The Nation discussed its interests in the IRW, but asked Tyson "not to pursue a course of action that would put the validity of the Cherokee Nation's claims" to parts of the IRW before the court. *Id.* at 647.

The litigation had sufficiently matured by November 15, 2007, that the district court issued a scheduling order: Discovery was to be completed by March 2, 2009, and trial was to be held the following September (the specific date of September 21, 2009, being set in a later order on April 24, 2009). Also, a day before the scheduling order the State sought a preliminary injunction enjoining Tyson from "(1) applying poultry waste to any land within the IRW and (2) allowing the application of poultry waste generated at its respective poultry feeding operations and/or the respective poultry feeding operations under contract with it to any land within the IRW." Aplee. Supp. App. at 130. The district court eventually denied the request for a preliminary injunction on September 29, 2008, and we affirmed. *See Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769 (10th Cir. 2009).

**B.      Motion to Dismiss**

Although Tyson's answer to the original complaint had raised the defense of failure to join a required party, Tyson did not take any formal steps regarding that defense until June 26, 2008, when it served the State with discovery requests seeking documents regarding agreements and communications between the State and the Nation with respect to claims to natural resources within the IRW.  On August 11, the State responded with several documents indicating that its claims to IRW resources potentially conflicted with those of the Nation.

Relying in part on the documents received, Tyson filed on October 31, 2008, a motion seeking to dismiss the case for failure to join the Nation.  Pointing to the Nation's historical claims of ownership over resources within the IRW and its concern about being subjected to multiple and inconsistent obligations, Tyson asserted that the Nation was a required party to the lawsuit.  *See* Fed. R. Civ. P. 19(a)(1).  And because the Nation was a sovereign entity that could not be joined without its consent, Tyson contended that the damages claims had to be dismissed under Fed. R. Civ. P. 19(b) (setting standard for dismissal of claims when required party cannot be joined).  In the alternative, Tyson moved for judgment as a matter of law on the ground that the State lacked standing to raise certain claims because it had not demonstrated that it had an ownership or trusteeship interest over the IRW's natural resources.

On the day that Tyson filed its Rule 19 motion, the Nation's Principal Chief issued a public statement regarding the motion. It said:

> The water rights of the Cherokee Nation came into existence long before the State of Oklahoma or the United States. From the time the Nation exchanged with the federal government all its land in the east with the land in northeastern Oklahoma, water rights have remained intact. However, I have to point out that the Cherokee Nation has not filed this motion to dismiss and it would be a mistake to assume that we support the unconditional dismissal of this lawsuit. The Cherokee Nation, like the state of Oklahoma, has to protect the water quality interests within our jurisdiction. . . . We will take time to analyze this filing and act accordingly. In the meantime, the Cherokee Nation hopes to continue working with the state on water rights discussions, so that tribal and state regulatory structures can cooperate in advancing our common interests.

Aplt. App., Vol. 4 at 743.

The State responded to the motion on January 8, 2009. The response devoted little attention to possible money claims by the Nation. It said: "[Tyson] ha[s] offered *no* evidence that an award of damages from [Tyson] to the State would as a practical matter impair or impede any [Nation] interest." *Id.*, Vol. 3 at 415. And after noting that the Nation "has not indicated that it intends to sue [Tyson]," it added that in any event, "CERCLA precludes double recovery of natural resource damages." *Id.* at 416. The State did not so much as hint that it was seeking any damages for the Nation's benefit.

Four months later, on May 19, 2009, while Tyson's Rule 19 motion was pending, the Nation and the State entered into an agreement (the Agreement) that acknowledged the Nation's "substantial interests in lands, water and other natural

resources located within the [IRW]." *Id.* at 532. The Agreement, which was purportedly effective on June 13, 2005 (the date the complaint was filed), was executed by the Attorneys General of the Nation and Oklahoma. It assigned to the State the Nation's right to prosecute any claims relating to those brought by the State in its lawsuit against Tyson. Although the Agreement asserted that "it is not necessary for the Court to resolve the precise nature of each sovereign's interests in lands, water and other natural resources of the [IRW]," *id.*, it also stated that should the court find it necessary to determine the nature of those interests, the Agreement would be "null and void," *id.* at 534.

On July 2, 2009, the district court held oral argument on Tyson's Rule 19 motion, and on July 22 it granted the motion in part and denied it in part. The court first concluded that the Agreement was invalid. It reasoned (1) that the Agreement did not meet Oklahoma's statutory standards for cooperative agreements with Indian Tribes; (2) that the Attorney General of the Nation was not authorized to enter into such agreements; (3) that Oklahoma law prohibited the assignment of state-law claims not arising out of contract (thereby negating the Nation's purported transfer of rights to prosecute the trespass and nuisance claims); and (4) that the Agreement's purported retroactivity was prohibited by Oklahoma law and, in any event, could not cure any jurisdictional defects that existed at the time the complaint was filed.

The district court then ruled that the Nation was a required party under Fed. R. Civ. P. 19, and, after observing that joinder was not feasible, dismissed each of the State's claims for damages. It explained that the damages claims could not be decided without the Nation's involvement:

> Without a legally binding assignment of the Cherokee Nation's rights and interests in the IRW, a damage award to the State either abridges the right of the Cherokee Nation to pursue its own claim for money damages or, to the extent the Cherokee Nation is not barred by issue or claim preclusion, conversely exposes defendants to the risk of multiple, inconsistent judgments. And . . . if the State loses its claim for damages, defendants face a real and substantial risk the Cherokee Nation, unfettered by issue and claim preclusion, would pursue damage claims on its own.

*Id.* at 564–65. The court also ruled that the State lacked standing "to prosecute monetary damage claims for injury to the [Nation's] substantial interests in lands, water and other natural resources located in the IRW." *Id.* at 567–68. In light of its ruling, the court dismissed as moot several outstanding motions regarding the damages claims. The State unsuccessfully moved for reconsideration. Also, Tyson and the State, joined by the Nation, engaged in settlement discussions. But that effort proved unsuccessful.

## C.    Motion to Intervene

On September 2, 2009, nineteen days before trial was scheduled to begin, the Nation filed a motion to intervene as of right under Fed. R. Civ. P. 24(a). The Nation's proposed intervenor complaint, asserting the Nation's ownership interest in the IRW, alleged CERCLA claims for cost-recovery and damages and a

federal-nuisance-law claim for damages and injunctive relief. The next day, the State, assuming that intervention by the Nation would resuscitate its own damages claims, moved to continue the trial for 120 days "in order to remove any obstacles to the granting of the Motion to Intervene by the Cherokee Nation," State's Motion for Continuance of Trial at 1, *Tyson Foods, Inc.*, No. 05-cv-329-GKF (PJC) (N.D. Okla. Sept. 3, 2009); and on September 10 it filed a response in support of the Nation's motion to intervene.

Tyson also filed a response on September 10. It contended that the Nation's motion to intervene was untimely. And with respect to the State's request for a 120-day continuance, Tyson argued that the request "grossly underestimate[d]" the need for additional time if the Nation were allowed to intervene. Aplt. App., Vol. 4 at 667. It asserted that "extensive discovery and briefing will be required to adjudicate the numerous additional, complex issues of law and fact by virtue of the Cherokee Nation's separate claims and interests." *Id.* It also said that resetting the trial date would cause severe disruption:

> [T]he calendars of defense counsel, defense witnesses and perhaps the calendar of the Court are not so malleable that a several month long trial can simply be penciled in a mere four months from now as the State suggests. Defense counsel, defense witnesses and this Court have postponed and delayed other important business and cases in order to accommodate Plaintiffs' demands for a September 21 trial date with the expectation that such matters can be attended to once this trial concludes in October or November of 2009.

*Id.* (citation omitted).

-13-

On September 15, six days before the scheduled trial date, the district court held a hearing on the Nation's motion. The Nation's Attorney General acknowledged that the Nation had "tried very diligently not to become a party to this lawsuit," had "never wished to have our ownership in the [IRW] an issue in this case," and had asked Tyson "not to assert our interest in the watershed." *Id.*, Vol. 5 at 869. But she argued that the motion was timely because the Nation had previously thought that it could rely on the State to protect its "interest in addressing the pollution," *id.* at 879, and did not discover until the court's July 22 order that it could not. She also contended that the Nation would suffer prejudice if it were not permitted to join because, among other reasons, it lacked the resources to prosecute the case without the State's assistance. She conceded that there would be some delay were the Nation's motion granted, but argued that no more than a two-month delay would be necessary.

The State supported the Nation's position. It argued that permitting intervention would not enlarge the scope of the original claims and would entail only minimal additional discovery. It further contended that the Nation's motion was timely because the Nation had reasonably believed until the district court's July 22 order that the State was adequately protecting its interests.

Tyson countered that because the Nation had sat on its rights until September 2009, its motion was untimely. It also contended that intervention would cause great disruption to the case, because resuscitating previously

-14-

dismissed claims would require addressing new, complicated issues, such as the extent of the Nation's ownership over the IRW and whether any statute of limitations barred its claims.

The district court denied the Nation's motion. It said:

This is not a particularly easy issue and there is no perfect resolution to this issue. This case was filed over four years and three months ago, and trial is scheduled to begin less than a week from today. As previously stated, the Nation admits . . . "there's a possibility for delay" . . . in the event this Court were to permit intervention. The Nation attaches to its motion a proposed intervenor's complaint with three causes of action. The filing of an intervenor's complaint, including a federal common law nuisance claim would trigger more than a 120 day delay. It would require the reinsertion of three causes of action that were previously dismissed, the consequent resuscitation of numerous motions pertaining to those causes of action, both motions for summary judgment and motions in limine. Perhaps more significantly, it would trigger the necessity of a new round of discovery pertaining to at least the statute of limitations issues, a new round of motions for summary judgment and likely a new round of motions in limine, in addition to those 41 that have already been filed.
  Such an approach would result in delay and expense, which would severely prejudice the parties who have been actively proceeding toward trial these past four-plus years. [Tyson] ha[s] adequately demonstrated that the Cherokee Nation knew of its interest in this case from the outset of the litigation but chose not to intervene for a number of reasons and the Court will not second-guess those reasons.
  The Nation will not be prejudiced in the sense that its claims will not be impaired by the denial of its motion to intervene. The Cherokee Nation may bring its claims in a separate lawsuit if it wishes. This Court—would have been pleased to grant the Nation's motion to intervene if it had been timely. Unfortunately it is not. For these reasons, as well as the other reasons set forth in the defendants['] brief, the motion to intervene . . . is denied.

*Id.* at 927–28.

-15-

On September 24, 2009, the State and Tyson proceeded to a bench trial on the State's equitable claims. Trial took 52 days and the parties are awaiting final judgment.

## II.    DISCUSSION

Fed. R. Civ. P. 24(a)(2) provides, in pertinent part, as follows:

On timely motion, the court must permit anyone to intervene who:

 . . . .

claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interests, unless existing parties adequately represent that interest.

Thus, a movant may intervene as a matter of right if  "(1) the [motion] is timely, (2) the [movant] claims an interest relating to the property or transaction which is the subject of the action, (3) the [movant's] interest may be impaired or impeded, and (4) the [movant's] interest is not adequately represented by existing parties." *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1103 (10th Cir. 2005).  Timeliness is the sole matter of dispute in this appeal.

### A.    Standard of Review

We review a district court's ruling on timeliness for an abuse of discretion. *See Coal. of Ariz./N.M. Counties for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 840 (10th Cir. 1996).  Under the abuse-of-discretion standard, "a trial court's decision will not be disturbed unless the appellate court has a definite

-16-

and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir.1997).

## B.      The Timeliness of the Nation's Motion

The timeliness of a motion to intervene is determined "in light of all of the circumstances." *Sanguine, Ltd. v. U.S. Dep't of Interior*, 736 F.2d 1416, 1418 (10th Cir. 1984). We have recognized three factors as particularly important: "[(1)] the length of time since the [movant] knew of [its] interests in the case; [(2)] prejudice to the existing parties; [and (3)] prejudice to the [movant]." *Id.* But these consideration are not exclusive and the trial court should also consider "the existence of any unusual circumstances." *Id.* The Nation contends that these factors establish an abuse of discretion. We disagree.

### 1.      Length of Time Since the Nation Knew of its Interest

"When the applicant appears to have been aware of the litigation but has delayed unduly seeking to intervene, courts generally have been reluctant to allow intervention." 7C Charles A. Wright et al., Federal Practice & Procedure § 1916, at 539–40 (3d ed. 2007). In this case it is undisputed that the Nation had been aware of the litigation for more than four years before its eve-of-trial motion to intervene. Indeed, even before suit was filed in June 2005, the Nation's Principal Chief wrote to the Oklahoma Attorney General about "the proposed lawsuit." Aplt. App., Vol. 4 at 688.

-17-

The Nation and the State argue, however, that the timeliness of the Nation's motion must be measured only from when it had reason to recognize that its interests were not being adequately represented by a party to the litigation. In particular, they contend that the Nation reasonably believed that the State was adequately representing its interests until shortly before the motion to intervene. According to them, (1) it was only on October 31, 2008, when Tyson filed its Rule 19 motion to dismiss for absence of a required party, that the Nation became aware of the possibility that its interests would not be adequately represented by the State, and (2) it was not until July 22, 2009, when the district court ruled on that motion, that the Nation definitively knew that the State could not in fact represent its interests.

We agree that a potential party could not be said to have unduly delayed in moving to intervene if its interests had been adequately represented until shortly before the motion to intervene. After all, an earlier motion to intervene—when the movant's interests were adequately represented by a party—would have been denied. *See San Juan County, Utah v. United States*, 503 F.3d 1163, 1203 (10th Cir. 2007) (plurality opinion). Therefore, we join the other circuits that measure delay from when the movant was on notice that its interests may not be protected by a party already in the case. *See Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 322 (7th Cir. 1995) ("[W]e do not expect a party to petition for intervention in instances in which the potential intervenor has no reason to believe its interests

-18-

are not being properly represented . . . ."); *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994) ("A better gauge of promptness is the speed with which the would-be intervenor acted when it became aware that its interests would no longer be protected by the original parties."); *Hill v. W. Elec. Co.*, 672 F.2d 381, 386 (4th Cir. 1982) ("[C]ritical issue with respect to timeliness is whether the proposed intervenor moved to intervene 'as soon as it became clear that the interests of the unnamed class members would no longer be protected by the named class representatives.'" (quoting *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977) (ellipsis omitted)); *Legal Aid Soc'y of Alameda Co. v. Dunlop*, 618 F.2d 48, 50 (9th Cir. 1980) ("[T]he relevant circumstance here for determining timeliness is when the intervenor became aware that its interest would no longer be protected adequately by the parties . . . ."); *cf. Elliott*, 407 F.3d at 1103 ("Prior to the district court's entry of final judgment it was reasonable for [the prospective intervenor] to rely on Appellees to argue the issue of subject matter jurisdiction.").

There may, of course, be different degrees of clarity of notice that a party cannot or will not represent a potential movant's interest; and the district court will need to consider that clarity (or lack of it) in weighing the factors for and against intervention. For example, the court could expect the motion to intervene to be filed promptly when delay could significantly prejudice other parties, even though the inadequacy of representation is not free from doubt.

It helps the Nation little, however, to measure its delay from when it was on notice that the State might not adequately represent its interests. It had such notice long before its motion. True, in one respect the Nation had every reason to expect the State to protect its interests. In seeking injunctive relief against Tyson, the State was doing all that the Nation might wish to do in that regard. Moreover, in seeking funds from Tyson under CERCLA to remedy the effects of prior pollution (say, money for decontaminating an area), the State may have been doing just what the Nation would have wanted. But the Nation's interests that are relevant to the question before us are the interests pursued in its proposed complaint in intervention; and, as we shall see, the Nation has made no showing that it ever had reason to rely on the State to pursue many of those interests on its behalf.

The Nation's proposed complaint stated three causes of action. All relied on essentially the same allegations against Tyson as those in the State's complaint, except that they alleged the interests of the Nation, rather than the State, with respect to the alleged pollution. The first count was for CERCLA cost recovery under 42 U.S.C. § 9607. It alleged that as a result of Tyson's improper release of hazardous substances into the IRW, the Nation "has incurred, and will continue to incur, necessary response costs . . . includ[ing] . . . costs of monitoring, assessing and evaluating water quality, wildlife and biota in the IRW." Aplt. App., Vol. 4 at 627–28. "Accordingly," said the complaint, the

"Nation is entitled to recover from [Tyson] all of the [Nation's] past and present necessary response costs" and to a declaratory judgment that Tyson is liable "for all future necessary response costs incurred by the [Nation]." *Id.* at 628. The State, however, had not sought recovery of past, present, or future response costs of the Nation. Rather, it sought "all of the *State of Oklahoma's* past and present necessary response costs," and sought a declaratory judgment that Tyson was liable for "all future necessary response costs incurred *by the State of Oklahoma*." *Id.,* Vol. 2 at 324 (emphasis added). The Nation could never have reasonably thought that the State was representing the Nation's interests in recovering its damages. Even if the Nation believed that it would not need to recover any future response costs because the State would be doing all the responding (although nothing in the record supports that belief), the prayer for recovery of response costs already incurred by the Nation could not be answered by a State victory in its suit.

The Nation's second count, for CERCLA resource damages under 42 U.S.C. § 9607, is similar. It alleges that Tyson's pollution has resulted in "injury to, destruction of, and loss of natural resources in the IRW, . . . for which the [Nation] is trustee," just as the State alleged its trustee status in its complaint. *Id.*, Vol. 4 at 629. The count then alleges that the Nation "has incurred reasonable and necessary costs to assess and evaluate this injury, destruction and loss of the natural resources" and seeks damages, including "(a) the cost to

-21-

restore, replace, or acquire the equivalent of such natural resources; (b) the compensable value of lost services resulting from the injury to such natural resources; and (c) the reasonable cost of assessing injury to the natural resources and the resulting damages." *Id.* at 630. Again, however, the State's complaint did not seek such damages for the Nation, and the Nation could not have reasonably thought that the State was representing its interests in those damages. As with the first count, the Nation may have thought that it would not need to seek future damages because the State would "restore, replace, or acquire the equivalent" of the injured or lost resources; but the State's suit could not have recovered for the Nation the cost of assessing injury or the value to the Nation of lost services.

As for the Nation's third count, a claim of federal common-law nuisance, the injunctive relief sought is identical to what the State sought on its claims that went to trial. But the compensatory and punitive damages sought by the Nation for past and future injury could not have been recovered for the Nation in the State's suit. The Nation has not argued any theory under which the State could have adequately represented the Nation's interest in obtaining monetary relief on this claim.

We can sum up as follows regarding the three types of interests that the Nation sought to pursue in its proposed complaint. First, insofar as the Nation had an interest in injunctive relief against Tyson, it could have reasonably

assumed from the outset of the suit that the State would adequately represent the Nation's interests, and nothing that occurred before the Nation moved to intervene would suggest the contrary. The district court ruled that the State could pursue its injunctive relief and has held a trial on that matter. The Nation had no need to intervene in that trial; and apparently it never sought to modify its motion to intervene to allow it to be a party at that trial.

Second, insofar as the Nation had an interest in recovering past response and assessment costs under CERCLA and both compensatory damages (for past and future injury) and punitive damages under federal common law, the State's complaint never sought such recovery for the Nation, and nothing in the record suggests that the Nation could have reasonably believed that those interests would be adequately protected by the State in its lawsuit.

Third, insofar as the Nation had an interest in damages for its future response and restoration costs under CERCLA, the State's complaint did not seek such damages for the Nation. Perhaps the Nation could have believed that the State's suit would protect this interest of the Nation because success in the State's suit would eliminate any need for the Nation to incur such future costs; but nothing in the record directly supports such a belief.

Accordingly, for much, perhaps most, of what the Nation sought in its proposed complaint, nothing had happened in the four-plus years since the State filed its complaint that would indicate that the State could no longer adequately

represent the Nation's interests. Either the Nation's interests were never represented by the State (the interest in past CERCLA damages and in all common-law-nuisance compensatory and punitive damages) or were still being adequately represented by the State (the interest in injunctive relief). In particular, with respect to these interests the Nation could not point to some event shortly before it moved to intervene that could explain a sudden effort to intervene. On this basis alone, the district court could properly find an unjustified delay by the Nation in seeking to intervene.

Moreover, even if one assumes that the Nation reasonably believed when the State filed its suit that the Nation would be protected by the suit from incurring future costs to remedy the alleged pollution, the Nation can still be charged with a delay of almost a year. The Nation was on notice that its reliance on the State was questionable when Tyson filed its motion to dismiss in October 2008. Indeed, the Nation was certainly aware of the risk to its interests in early 2009 when it began negotiations with the State to assign it those interests. The Nation has not explained why it could not have moved to intervene at the same time that it was conducting those negotiations; such a motion would have protected it in the event of deadlocked negotiations or, as happened, court rejection of the agreement. If the date for commencement of trial had still been far off, it may have made perfect sense to try negotiating before moving to intervene. But given the imminent date for a lengthy trial, the district court could

-24-

decide that the Nation (and the State) were taking an unreasonable risk by putting all their eggs in the negotiated-agreement basket. A potential intervenor cannot ignore the prejudice to others that could result from a last-minute intervention.

Likewise, the Nation's attempts to facilitate settlement of the case in August 2009 (a month before trial) came too late to justify delay in moving to intervene. After all, a party cannot excuse its unreadiness for trial on the ground that it had been trying to settle the dispute. At some point well before trial a party must realize that it needs to plan for the possibility that negotiations will fail.

That said, however, we recognize that delay in itself does not make a request for intervention untimely. "The requirement of timeliness is not a tool of retribution to punish the tardy would-be-intervenor . . . ." *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1250 (10th Cir. 2001) (internal quotation marks omitted). The other factors in the test for untimeliness must also be considered. *See id.* (timeliness requirement is a "guard against prejudicing the original parties by the failure to apply sooner" (internal quotation marks omitted)); 7C Wright et al., *supra* § 1916, at 541–48 ("The most important consideration in deciding whether a motion for intervention is untimely is whether the delay in moving for intervention will prejudice the existing parties to the case."). We now turn to those factors.

### 2.    Prejudice to Existing Parties

The district court explained the nature of the prejudice that the existing parties could suffer:

> This case was filed over four years and three month ago, and trial is schedule to begin less than a week from today. As previously stated, the Nation admits . . . "there's a possibility for delay" . . . in the event this Court were to permit intervention. . . . The filing of an intervenor's complaint, including a federal common law nuisance claim would trigger more than a 120 day delay. It would require the reinsertion of three causes of action that were previously dismissed, the consequent resuscitation of numerous motions pertaining to those causes of action, both motions for summary judgment and motions in limine. Perhaps more significantly, it would trigger the necessity of a new round of discovery pertaining to at least the statute of limitations issues, a new round of motions for summary judgment and likely a new round of motions in limine, in addition to those 41 that have already been filed.
>       Such an approach would result in delay and expense, which would severely prejudice the parties who have been actively proceeding toward trial these past four-plus years.

Aplt. App., Vol. 5 at 927–28.

The Nation concedes that "the original parties . . . will suffer some discomfort if intervention is granted." Aplt. Br. at 20. And it has not disputed the gist of the district court's observations about what would have needed to be done before trial had the court permitted intervention. In any event, those observations are amply supported by the record. For example, to prepare for the Nation's proposed common-law nuisance claim, discovery would have been necessary regarding the Nation's ownership of resources in the IRW; and because the claims could be subject to a statute of limitations, that issue would also need to be investigated. Further, Tyson indicated that it would defend against the

-26-

Nation's claim by arguing that the Nation was responsible for the presence of certain pollutants in the IRW, thus raising another issue requiring discovery. The CERCLA damages claims would also require additional discovery because the district court had ruled (in granting Tyson's motion to dismiss the damages claims under Rule 19) that damages under CERCLA would need to be awarded to the State and the Nation in proportion to the actual management and control exercised by each plaintiff over the injured resources, a matter not yet resolved, or even investigated, in the case.

The State and Nation argue that these matters would not be the consequence of any delay in the Nation's moving to intervene but simply the result of allowing intervention. They point out, correctly, that the prejudice to other parties must be prejudice caused by the movant's delay, not by the mere fact of intervention. *See Clinton*, 255 F.3d at 1251. But the point here is not that intervention by the Nation would require more work by the existing parties. That in itself did not concern the district court, which said that it would gladly have granted a motion to intervene if it had been made earlier. Rather, the court's reference to the need for this work explained why intervention would require a substantial delay before the case could go to trial. *Cf. id.* (intervention proper when "no scheduling order ha[d] been issued, no trial date set, and no cut-off date for motions set"). And that last-minute delay would create prejudice—prejudice that would not have resulted from an earlier intervention. Perhaps a short delay

in trial could be accommodated without much of a burden. But the delay of more than 120 days anticipated by the district court would be something else. With the start date set for less than three weeks from the date of the Nation's motion to intervene, the parties had necessarily already arranged their schedules and the schedules of their witnesses. For example, the numerous attorneys (the record shows that at the hearing on the motion to intervene, the State had 11 attorneys and the six defendants were represented by 18 attorneys from nine firms) would have removed other obligations from their calendars for the next several months. And at the hearing, counsel for Tyson represented that "[d]ozens of witnesses have cleared their schedule and some of them are here, ready to go. We have moved to Tulsa [and] set up war rooms . . . ." Aplt. App., Vol. 5 at 917.

The State and the Nation argue that Tyson has exaggerated the burden of delaying the trial, pointing out that Tyson had requested a continuance not long before the Nation moved to intervene. To be sure, Tyson had filed such a motion on June 30; but it requested only an indefinite "brief postponement," Def.'s Mot. for Modification of May 14, 2009 Scheduling Order & Integrated Br. in Supp. at 3, *Tyson Foods, Inc.*, No. 05-cv-329-GKF (PJC) (N.D. Okla. June 30, 2009). And Tyson's motion reads less like a request for continuance than a plea for rulings on numerous pending motions (for summary judgment and the exclusion of expert testimony) that would impact trial preparation. The thrust of the motion was that

Tyson needed to be able to plan efficiently for trial, the same interest that it raised in opposing the delay that would result from the Nation's intervention.

The district court could properly decide that the prejudice to Tyson would be significant. *See Culbreath v. Dukakis*, 630 F.2d 15, 22 (1st Cir. 1980) ("The purpose of the basic requirement that the application to intervene be timely is to prevent last minute disruption of painstaking work by the parties and the court."). (The impact on the State could be similar, but the State clearly thought that the advantages of being able to pursue its damages claims at the trial outweighed the costs of delay.)

### 3.      Prejudice to the Movant

The third factor—prejudice to the movant from denying intervention—also weighed in favor of denial. As the district court said: "The Nation will not be prejudiced in the sense that its claims will not be impaired by the denial of its motion to intervene. The Cherokee Nation may bring its claims in a separate lawsuit if it wishes." Aplt. App., Vol. 5 at 928.

The Nation's opening brief on appeal argues prejudice, but only tersely. The entire discussion of the specific prejudice in this case consists of the following paragraph:

> Practically, the Cherokee Nation may have no adequate alternative if the intervention is denied. If this cases continues the Cherokee Nation, while it may not be legally bound as a party, may find itself unable to prosecute its claims against [Tyson]. Since both the State and the Nation must bring their claims for damages

-29-

collectively against [Tyson], [1] the Nation's claims may well be practically barred by res judicata if the State of Oklahoma is unsuccessful in its case for injunctive relief currently pending before the District Court and barred from re-alleging its claims based upon the same facts. [2] In addition, a loss by the State of Oklahoma at the District Court could well lead to appeals regarding multiple issues, including the issue of whether the Cherokee Nation has any rights to the waters of the Illinois River Watershed. By function of the District Court's denial of the Cherokee Nation's motion to intervene, the Nation would have no input into how this Court decided those issues, except perhaps as an amicus.

Aplt. Br. at 21.

As we understand the Nation's first point—its practical-bar argument—it is concerned that if the State loses at the bench trial on equitable relief, the State could be barred by res judicata from pursuing damages claims in a later suit and therefore could not join the Nation in such a suit. In our view this concern was not adequately presented to the district court. Res judicata is not mentioned in the Nation's opening and reply briefs submitted to the district court in support of its motion to intervene. And the only references to the doctrine at the hearing on the motion are so brief that they would naturally be understood (and may well have been intended) to refer to the possibility that the Nation itself would be barred by the doctrine.[2] *See Tele-Commc'ns, Inc. v. Comm'r*, 104 F.3d 1229,

---

[2]The first reference to res judicata by the Nation's Attorney General came in the following comment:

We could bring a new CERCLA lawsuit, Your Honor. The problem, we believe that we would have to join the State of Oklahoma pursuant to your Honor's finding. They have immunity. We would

(continued...)

1232 (10th Cir. 1997) ("Generally, an appellate court will not consider an issue raised for the first time on appeal.").  In any event, the possibility of prejudice is more speculative than real.  The Nation has consistently stated that it would rely on the State's efforts to prove the claims against Tyson. Why, then, would the Nation expect to be able to prevail in a damages trial if the State cannot obtain a favorable result in the trial of equitable issues?  (We further note that the Nation never sought to intervene for just the trial on equitable issues.)

The Nation's other prejudice argument fares no better.  Its rights in the IRW cannot be affected by the State's lawsuit if it is not also a party.  And to the

---

[2](...continued)
have to do all of these things that have already been done in this lawsuit and also, Your Honor, depending on what happens here, we might very well face the real issues of res judicata or issue preclusion.  Depending upon what happens to the State's case in this lawsuit it could very well affect any later lawsuit.

Aplt. App., Vol. 5 at 877.   Later, the Attorney General was even more abbreviated:

Prejudice to the applicant we've talked about, it's not just money, it's also the time, the issue preclusion, res judicata, bringing in another sovereign, starting all over, the existence of any unusual circumstances.

*Id.* at 905.  The Tyson attorney obviously thought that these comments were suggesting that the Nation itself could be barred.  His response was:

Issue preclusion does not run against a nonparty, so that's just a complete red herring.

*Id. at* 926.

extent that it wishes to be heard if those rights somehow become an appellate issue, its participation as an amicus would seem perfectly adequate.

### 4. Unusual Circumstances

Finally, we consider whether unusual circumstances argue for or against permitting the Nation to intervene. Two such circumstances here might be that the delay caused by intervention would have adverse effects (1) on the public interest in a prompt injunction against pollution by Tyson and (2) on the efficient operation of the district court (with negative impacts on litigants in other cases).

With respect to the first potentially adverse impact, the State decided that any benefit from a prompt injunction would be outweighed by the desirability of jointly trying the injunction and damages claims. Although the district court would not necessarily be bound by the State's assessment of the public interest, the court had already denied a preliminary injunction and it did not rely on this public interest in denying intervention. We therefore give no weight to this consideration.

As for the adverse impact on the district court and on litigants in other lawsuits, the continuance that would have been necessary to allow the Nation's intervention could have wreaked havoc on the court's calendar. Again, however, the court did not rely on this prejudice in denying intervention (although Tyson raised it both below and on appeal). We therefore have confined our analysis to

the three factors on which courts customarily focus in determining timeliness of a motion to intervene.

### 5.    Summary

In light of the record before the district court regarding undue delay, prejudice to the parties, and prejudice to the Nation, the court did not abuse its discretion in denying intervention.

## III.    CONCLUSION

We AFFIRM the denial of the Nation's motion to intervene.

No. 09-5134, *Oklahoma v. Tyson Foods, et al.*

**TACHA**, Circuit Judge, dissenting:


I respectfully dissent. Rule 19(a) and Rule 24(a)(2) "are intended to mirror each other." *Oneida Indian Nation v. Madison Cnty.*, 605 F.3d 149, 162 (2d Cir. 2010); *see also* Fed. R. Civ. P. 24, 1966 Amendment Note ("Intervention of right is here seen to be a kind of counterpart to Rule 19(a) . . . ."). "If a party is not 'necessary' under Rule 19(a) then it cannot satisfy the test for intervention as of right under Rule 24(a)(2)." *Oneida Indian Nation*, 605 F.3d at 162 (alterations omitted). Likewise, an applicant under Rule 24(a)(2) "is [generally] entitled to intervene in an action when his position is comparable to a [necessary party] under Rule 19(a)[]." Fed. R. Civ. P. 24, 1966 Amendment Note.

Of course, even if a party is deemed "necessary" under Rule 19(a), it will not be permitted to intervene under Rule 24(a)(2) if its motion is untimely. Although not an exhaustive list of the circumstances that render a motion to intervene untimely, an applicant's motion is generally untimely if: (1) the applicant has delayed unduly in bringing its motion to intervene, *see* 7C Charles A. Wright et al., Federal Practice & Procedure § 1916 at 539–40 (3d ed. 2007) ("When the applicant appears to have been aware of the litigation but has delayed unduly seeking to intervene, courts generally have been reluctant to allow intervention."); or (2) the timing of the applicant's intervention will cause undue prejudice to the existing parties, *see Utah Ass'n of Cntys v. Clinton*, 255 F.3d

1246, 1250 (10th Cir. 2001) ("The requirement of timeliness is not a tool of retribution to punish the tardy would-be intervenor, but rather a guard against prejudicing the original parties by a failure to apply sooner.").

In this case, the district court held that the Nation is a "necessary party," however, just over a month later, it denied the Nation's motion to intervene as untimely. In my view, the Nation did not delay unduly in moving to intervene, nor would the timing of its intervention cause prejudice to the existing parties which outweighs the prejudice that would be caused by its exclusion from this lawsuit. Accordingly, I respectfully dissent from the majority's opinion which affirms the denial of the Nation's motion to intervene.

To begin, the majority applies the incorrect standard of review. Although we normally review a district court's ruling on timeliness for an abuse of discretion, *see, e.g.*, *Coal. of Ariz./N.M. Cntys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 840 (10th Cir. 1996), when a district court's decision is premised on an improper legal standard, it is not entitled to deference. *See Kretzinger v. First Bank of Waynoka*, 103 F.3d 943, 946 (10th Cir. 1996) ("[W]hen a lower court's factual findings are premised on improper legal standards or on proper ones improperly applied, they are not entitled to the protection of the clearly erroneous standard, but are subject to *de novo* review."). The majority adopts a timeliness test that measures the applicant's delay from the time it could no longer reasonably believe its interests were adequately

-2-

represented by an existing party. The district court, however, did not apply this test. Rather, it held that "[t]he defendants have adequately demonstrated that the Cherokee Nation *knew of its interest in this case from the outset of the litigation.*" Aplt. App. Vol. V at 927–28 (emphasis added). Because the district court did not, in considering the timeliness of the Nation's motion to intervene, take into account whether the Nation could have reasonably believed its interests were adequately represented by an existing party, it did not apply the correct test for timeliness. Therefore, its decision should be reviewed de novo rather than for an abuse of discretion.

Next, while I agree with the majority's newly adopted test for timeliness, I cannot concur in its application of that test. As the majority correctly holds, when assessing the timeliness of a motion to intervene under Rule 24(a)(2), the applicant's delay in bringing the motion is measured from the time the applicant could no longer reasonably believe its interests were adequately represented by an existing party.[1] *See Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 322 (7th Cir. 1995) ("[Applicants] *reasonably believed* their employer was representing their

---

[1]Although the majority confusingly states that "we join the other circuits that measure delay from when the movant was *on notice* that its interests *may not be protected* by a party already in the case," Maj. at 18 (emphasis added), the majority's application of this standard correctly measures delay from when the Nation could no longer *reasonably believe* its interests were adequately represented. *See* Maj. at 21 ("The Nation could never have reasonably thought that the state was representing the Nation's interests in recovering its damages.").

interests.") (emphasis added); *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994) ("[T]he movants *legitimately believed* that the Forest Service would defend its timber sales and planning.") (emphasis added) (quotations omitted); *Hill v. W. Elec. Co.*, 672 F.2d 381, 386 (4th Cir. 1982) ("[T]he critical issue with respect to timeliness is whether the proposed intervenor moved to intervene as soon as *it became clear* that the interests of the unnamed class members would no longer be protected by the named class representatives.") (emphasis added). With respect to the CERCLA damages claims, the majority concludes that the Nation could never have reasonably believed that its interests were adequately represented by the State because "[t]he State . . . had not sought recovery of past, present, or future response costs of the Nation." Maj. at 20–21. In other words, the majority holds that an applicant under Rule 24(a)(2) who is seeking damages cannot reasonably believe that its interests are adequately represented by an existing party unless an existing party explicitly seeks damages on behalf of the applicant.

The rule is simply not construed so narrowly. Indeed, "[t]he representation whose adequacy comes into question under [Rule 24(a)(2)] is not confined to formal representation like that provided by a trustee for his beneficiary or a representative party in a class action for a member of the class." Fed. R. Civ. P. 24, 1966 Amendment Note. Rather, we have gone so far as to presume adequate representation "when an applicant for intervention and an existing party have the

-4-

same ultimate objective in the litigation." *Clinton*, 255 F.3d at 1255. There can be little doubt that the ultimate objectives of the State and the Nation were congruent with respect to the CERCLA claims—they both sought to recover monetary damages from Tyson in order to compensate for and repair the damage it allegedly caused to the IRW.

The majority also holds that even if the Nation could have reasonably believed its interests were adequately represented by the State when the lawsuit was initially filed, it "can still be charged with a delay of almost a year," from the time Tyson filed its Rule 19 motion. Maj. at 24. I disagree. In my view, at the time Tyson filed its Rule 19 motion, the Nation could have reasonably believed its interests were adequately represented because it could have reasonably believed that the State would be allowed to pursue CERCLA damages individually, and that the State and Nation could then jointly apportion those damages through agreement or in subsequent litigation.

In resolving Tyson's Rule 19 motion, the district court concluded that "the only feasible way to compensate the co-trustees and avoid a double recovery or unjust enrichment to one trustee at the expense of another is to award damages in the ratio or percentage of actual management and control that is exercised by each of the various co-trustees," and that it could "make no determination of the ratio or percentage of actual management and control exercised by the [Nation] in the Nation's absence." *Oklahoma v. Tyson Foods, Inc.*, 258 F.R.D. 472, 480 (N.D.

-5-

Okla. 2009).  For this point, the district court relied on *Coeur D'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 2d 1094 (D. Idaho 2003) ("*Coeur D'Alene I*").  That decision, however, had been subsequently reconsidered and reversed by the judge who issued it.  *See United States v. Asarco Inc.*, 471 F. Supp. 2d 1063, 1068 (D. Idaho 2005) ("*Coeur D'Alene II*") ("The Court revises its trusteeship ruling . . .").  Indeed, in *Coeur D'Alene II*, Judge Lodge held:

> The language of the statute dictates that a co-trustee acting individually or collectively with the other co-trustees may go after the responsible party or parties for the full amount of the damage, less any amount that has already been paid as a result of a settlement to another trustee by a responsible party.  If there is a later disagreement between the co-trustees, that disagreement would have to be resolved by successive litigation between the trustees, but it could in no way affect the liability of the responsible party or parties.

*Id*.  Thus, until the district court resolved Tyson's Rule 19 motion on July 22, 2009, the Nation could have, in reliance on *Coeur D'Alene II*, reasonably believed that the State could adequately represent its interest in this lawsuit.[2]  In my view, the Nation's delay should be measured from that date.

Next, I cannot agree with the majority's assessment of the prejudice that the Nation's intervention would cause Tyson.  "The prejudice prong of the timeliness inquiry measures prejudice caused by the intervenor's delay—not by

---

[2]I express no view on whether the district court properly resolved Tyson's Rule 19 motion.  Rather, I only point out that until that motion was resolved, the Nation could have reasonably believed that the district court would adopt the position of *Coeur D'Alene II* rather than the position of *Coeur D'Alene I* regarding the CERCLA trustee issue.

the intervention itself." *Clinton*, 255 F.3d at 1251 (quotations omitted). In its discussion of the prejudice Tyson would suffer if the Nation were permitted to intervene, the majority first cites the potential need for additional discovery and additional motions regarding the Nation's claims. The fact that intervention may "double the work load" or "add issues" to a case, however, is a product "of intervention itself rather than the timing of the motion to intervene." *Id.*

The majority further notes that because the trial date was less than three weeks away at the time the Nation sought to intervene, its intervention and the trial delay it would cause would significantly disrupt Tyson's attorneys' and witnesses' schedules. To be sure, Tyson would suffer some added cost because of a trial delay only three weeks before trial was set to begin; however, Tyson is at least partly responsible for this belated delay and the attendant added cost. Although Tyson raised its Rule 19 defense in its answer, it waited over three years to pursue it. And, because the Nation could have reasonably believed its interests were adequately represented until the district court deemed it a "necessary" party, Tyson's own delay in bringing its Rule 19 motion was a causal factor in the timing of the Nation's motion to intervene. In my view, Tyson cannot now complain about the timing of the Nation's motion to intervene when Tyson is at least partly responsible for that timing. Furthermore, Tyson should not be rewarded for waiting to pursue its Rule 19 defense until it would be arguably too late for the Nation to intervene.

I also cannot sympathize with Tyson's protestations of the prejudice that would be caused by a trial delay when not long before the Nation sought to intervene, Tyson sought to continue the trial. It is irrelevant that Tyson's motion for a continuance may "read[] less like a request for a continuance than a plea for rulings on pending motions." Maj. at 28. The fact remains that on June 30, 2009, Tyson sought to delay the trial and even argued that "[a] short continuance of the trial date *would not prejudice any party*." Def's Mot. for Modification of May 14, 2009 Scheduling Order & Integrated Br. in Supp. at 3, *Tyson Foods, Inc.*, No. 05-cv-329-GKF-PJC (N.D. Okla. June 30, 2009) (emphasis added). In my view, Tyson's request for a continuance and its claim on June 30 that a trial delay would not prejudice any party greatly undermines its claim only two months later that a trial delay would cause it extreme prejudice.

Finally, in discussing whether any unusual circumstances counsel for or against allowing the Nation to intervene, the majority ignores one obvious unusual circumstance—the significant loss the State will potentially incur if the Nation is excluded from this lawsuit. During the more than three years that Tyson waited to bring its Rule 19 defense, the State expended significant time and money to develop its damages claims. When the district court ruled in favor of Tyson on its Rule 19 motion, all of those claims were dismissed. If the Nation is not permitted to intervene, the State and Nation will have to pursue the hundreds of millions of dollars in damages the State initially sought on its own, together in

a subsequent lawsuit. Neither the State nor the Nation believes a subsequent cooperative suit is a realistic possibility. *See* Aplt. App. Vol. V at 875 (Attorney General of the Nation explaining, "If we are not allowed to intervene in this lawsuit, we will have to, at some point, file a new lawsuit. We will have to try to join the State [] who also has immunity. Whether or not politically they can do it at that time is an issue. Whether or not we can afford to do it is a very real issue."); *see also* Br. of State of Oklahoma at 31 ("Because neither sovereign can be joined against its will, both would again need concurrently to waive their sovereignty. Such coordination of priorities is often difficult, potentially providing [Tyson] with an unwarranted and unjust escape from liability for damages and/or response costs."). Thus, if the Nation is excluded from this lawsuit, the State will potentially have wasted the significant amount of time and money it spent developing these complex damages claims. In my view, the loss Tyson would incur by having to rearrange its attorneys' and witnesses' schedules pales in comparison to the loss of time and money the State will potentially suffer if the Nation is excluded from this action.

In sum, the Nation did not delay unduly in seeking to intervene in this lawsuit. Rather, it acted quite prudently throughout and only sought to intervene when it could no longer reasonably believe that its interests were adequately represented by the State. Furthermore, because the prejudice the State will potentially suffer if the Nation is excluded from this case is significantly greater

than the prejudice Tyson will suffer if the Nation is permitted to intervene, I would reverse the district court's decision and allow the Nation to intervene so that all the claims relating to Tyson's alleged pollution of the IRW can be tried together in one lawsuit.  For these reasons, I respectfully dissent.