**PUBLISH**
**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 18, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

WESTERN ENERGY ALLIANCE,

    Plaintiff - Appellee,

v.

RYAN ZINKE, Secretary, United States
Department of the Interior; BUREAU OF
LAND MANAGEMENT,

    Defendants.

------------------------------

THE WILDERNESS SOCIETY;
WYOMING OUTDOOR COUNCIL;
SOUTHERN UTAH WILDERNESS
ALLIANCE; SAN JUAN CITIZENS
ALLIANCE; GREAT OLD BROADS
FOR WILDERNESS; SIERRA CLUB;
WILDEARTH GUARDIANS; CENTER
FOR BIOLOGICAL DIVERSITY;
EARTHWORKS,

    Movants to Intervene - Appellants,

UNITED STATES OF AMERICA,

    Amicus-Curiae.

No. 17-2005

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:16-CV-00912-WJ-KBM)**
_____

Michael S. Freeman, Earthjustice, Denver, Colorado (Robin Cooley and Yuting Chi, Earthjustice, Denver, Colorado; Kyle J. Tisdel, Western Environmental Law Center, Taos, New Mexico; Samantha Ruscavage-Barz, WildEarth Guardians, Santa Fe, New Mexico; and Michael Saul, Center for Biological Diversity, Denver, Colorado, with him on the briefs), appearing for Movants to Intervene-Appellants.

Mark S. Barron (Alexander K. Obrecht, with him on the briefs), Baker & Hostetler, Denver, Colorado, appearing for Appellee.

Jeffrey H. Wood, Acting Assistant Attorney General; Andrew C. Mergen, John S. Most, and Matthrew Littleton, Attorneys, Environmental and Natural Resources Division, United States Department of Justice, Washington, DC; Karen S. Hawbecker, Danielle DiMauro, and Wendy S. Dorman, Office of the Solicitor, United States Department of the Interior, Washington, DC, filed a brief for Amicus Curiae United States.

_____

Before **BRISCOE**, **HARTZ**, and **BACHARACH**, Circuit Judges.

_____

**BRISCOE**, Circuit Judge.

_____

Plaintiff-Appellee Western Energy Alliance ("WEA") filed this lawsuit in the United States District Court for the District of New Mexico against two Defendants: the Secretary of the United States Department of the Interior, and the Bureau of Land Management (the "BLM"). WEA sought relief under the Administrative Procedure Act, 5 U.S.C. §§ 701-06 (the "APA"), the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02 (the "DJA"). WEA alleged that the BLM has violated the Mineral Leasing Act, 30 U.S.C. §§ 181-287 (the "MLA"), by holding too few oil and gas lease sales. Several environmental advocacy groups moved to intervene in the suit: The Wilderness Society, Wyoming Outdoor Council, Southern Utah Wilderness Society, San Juan Citizens Alliance, Great Old Broads For Wilderness, Sierra Club, WildEarth

2

Guardians, Center For Biological Diversity, and Earthworks (collectively, the "conservation groups"). The district court denied the motion to intervene. The court concluded that the conservation groups had failed to show that the pending litigation has the potential to harm their environmental interests, or that the presently named parties could not adequately represent their interests. The conservation groups filed this interlocutory appeal to seek review of the denial of their motion to intervene. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and reverse and remand.

## I.

### Oil and Gas Leasing on Public Lands

The BLM has the authority to lease public lands with oil and gas reserves to private industry for development under the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701–1787 (the "FLPMA"), the MLA, and the BLM's own regulations and plans. See 43 C.F.R. Part 1600 (Planning, Programming, and Budgeting); 43 C.F.R. Subparts 3120 (Competitive Leases) and 3160 (Onshore Oil and Gas Operations). Both the MLA and the associated regulations provide for quarterly lease sales. 30 U.S.C. § 226(b)(1)(A) ("Lease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary."); see also 43 C.F.R. 3120.1-2(a) ("Each proper BLM S[t]ate office shall hold sales at least quarterly if lands are available for competitive leasing.").

The BLM "manages the use of federal oil and gas resources through a three-phase decision-making process." Pennaco Energy, Inc. v. United States Dep't of

3

Interior, 377 F.3d 1147, 1151 (10th Cir. 2004). In the first phase, the BLM develops resource management plans ("RMPs"). 43 U.S.C. § 1712; 43 C.F.R. Part 1600. RMPs indicate which parcels of public land are open or closed to oil and gas development. When drafting RMPs, the BLM is required by statute to apply multiple use management, which "describes the . . . task of striking a balance among the many competing uses to which land can be put, 'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values.'" Norton v. S. Utah Wilderness All., 542 U.S. 55, 58 (quoting 43 U.S.C. § 1702(c)). Additionally, the BLM "prepare[s] an environmental impact statement" in compliance with the National Environmental Protection Act (the "NEPA") when preparing an RMP. 43 C.F.R. § 1601.0-6. Generally, an RMP "describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps." Norton, 542 U.S. at 59. The applicable regulations also require that the public must have a chance "to become meaningfully involved in and comment on the preparation and amendment of" RMPs. 43 C.F.R. § 1610.2(a). All subsequent activity on the land, including oil and gas development, must conform to RMPs. See 43 C.F.R. § 1610.6-3(a).

In the second phase, through its State Offices,[1] the BLM identifies specific parcels that it will offer for lease in the competitive lease sale process. 43 C.F.R.

---

[1] The BLM is comprised of twelve State Offices with jurisdiction over a region: "(i) Alaska; (ii) Arizona; (iii) California; (iv) Colorado; (v) Eastern States; (vi) Idaho; (vii) Montana; (viii) Nevada; (ix) New Mexico; (x) Oregon;
(continued…)

4

Subpart 3120. The BLM retains discretion to choose which parcels to lease. <u>W. Energy All. v. Salazar</u>, 709 F.3d 1040, 1044 (10th Cir. 2013). "'Eligible' lands comprise all lands 'subject to leasing, i.e, lands not excluded from leasing by a statutory or regulatory prohibition.' 'Available' lands are those 'open to leasing in the applicable [RMP], . . . when all statutory requirements and reviews have been met.'" Amicus Br. at 6 n.2 (quoting BLM Manual 3120.11).

Also in the second phase, after a State Office decides which parcels to offer in a lease sale, the State Office posts a final sale notice listing those parcels at least 45 days before the sale date, and often 90 days before. 43 C.F.R. § 3120.4-2; App. at 187 (BLM Manual 3120 (updated February 18, 2013)). Once the notice is posted, the BLM's practice is to provide a 30-day protest period. App. at 187 (BLM Manual 3120 (updated February 18, 2013)). While a protest is pending, the BLM can suspend a specific parcel from the offering. 43 C.F.R. § 3120.1-3. Although "[s]tate offices should attempt to resolve protests before the sale of the protested parcels," protests unresolved by the lease auction date do not prevent bidding on the contested parcel. App. at 187 (BLM Manual 3120 (updated February 18, 2013)). If an RMP identifies land as open to development, a State Office can publish in the Federal Register a call for expressions of leasing interest, which anyone may file. <u>See</u> App. at 134. The regulations provide that "[l]ands included

_____

(…continued)
(xi) Utah; and (xii) Wyoming." App. at 16. Each State Office is divided into Field Offices. <u>Id.</u>

5

in any expression of interest" are "available for leasing" and "shall be offered for competitive bidding." 43 C.F.R. § 3120.1-1(e). The State Office then conducts a competitive lease sale auction. See 30 U.S.C. § 226(b)(1)(A).

In 2010, the Interior Department updated its second-phase practices (the BLM's identification of specific parcels to be offered for lease) by adopting Instruction Memorandum 2010-117 (the "Leasing Reform Policy"), following years of negotiation and litigation by the conservation groups. Aplt. Br. at 7, 20–21. The Leasing Reform Policy provides for additional review simultaneous with the NEPA analysis. App. at 136. Specifically, the Leasing Reform Policy: (i) requires an interdisciplinary team to review the parcels proposed for leasing and conduct a site visit, id. at 136–38; (ii) identifies issues the BLM must consider, id. at 136–37; and (iii) obliges the BLM to consult other stakeholders, such as federal agencies, and State, tribal, and local governments. Id. at 137. While each State Office must still hold at least four total lease sales per year where eligible lands are available, the Leasing Reform Policy mandates that State Offices schedule lease sales on a rotating basis. Id. at 136. The relevant section of the Policy states:

> State offices will continue to hold lease sales four times per year, as required by the Mineral Leasing Act, section 226(b)(1)(A), and 43 CFR 3120.1-2(a), when eligible lands are determined by the state office to be available for leasing. However, state offices will develop a sales schedule with an emphasis on rotating lease parcel review responsibilities among field offices throughout the year to balance the workload and to allow each field office to devote sufficient time and resources to implementing the parcel review policy established in this IM. State offices will extend field office review timeframes, as necessary, to ensure there is adequate time for the field offices to conduct comprehensive parcel reviews.

6

Id.  The BLM has adopted parts of the Leasing Reform Policy into its Manual and Handbook, "which are permanent agency guidance documents."  Amicus Br. at 3.

Finally, after selling a lease, and as part of the third phase of the BLM's decision-making process, the BLM also decides whether specific development projects will be permitted on the leased land.  The BLM's authority in this regard originates with the MLA, which gives the BLM the power to "regulate all surface-disturbing activities conducted pursuant to any lease issued under" the MLA and to set reclamation and other requirements necessary to conserve any surface resources. § 226(g); see generally 43 C.F.R. § 3162.3-1 (providing for drilling applications and plans).

*Case History*

On August 11, 2016, the WEA filed a complaint under the APA.  Count I alleges a FOIA violation.  This claim, which is not mentioned in the motion to intervene, is not relevant to this appeal.  Count II seeks a declaratory judgment, under the DJA, "that BLM's leasing policies and practices violate the" MLA by causing fewer than four lease sales per State[2] per year to take place.  App. at 39–40.  Count III alleges that the BLM's actions have resulted in fewer than the statutorily mandated four lease sales per year and thus are contrary to law;

---

[2] The WEA states that four lease sales per *State* are required; it is apparent in this context that WEA is referring to the State Offices, not to each of the fifty States.

7

specifically, contrary to the MLA, and in violation of the APA. The Prayer for

Relief, in relevant part, asks the district court to:

> 2. Declare the manner in which [the] BLM is presently scheduling and administering oil and gas lease sales unlawful as a violation of the express terms of the Mineral Leasing Act;
>
> 3. Require [the] BLM to immediately abandon all currently existing lease sale schedules that do not comply with the Mineral Leasing Act and to adopt promptly revised lease sale schedules that comply with the terms of the Mineral Leasing Act;
>
> 4. Direct [the] BLM to revise or rescind all agency guidance and instructional memoranda, including I.M. No. 2010-117, that direct implementation of [the] BLM's lease sale program in a manner contrary to law.

Id. at 42.

On October 19, 2016, the conservation groups moved to intervene in the

WEA's suit either as of right or permissively under Federal Rule of Civil Procedure

24(a) and (b), respectively. The WEA opposed their intervention. The BLM did not

take a position regarding the motion. In the motion to intervene, the conservation

groups argued that they had two protectable interests: (i) obviating and/or minimizing

the environmental impact of oil and gas development on public lands; and (ii)

preserving the reforms they had worked to implement, including the Leasing Reform

Policy. App. at 57–58.

On December 15, 2016, the district court held a hearing on the motion to

intervene. At the hearing, the WEA stated that it is primarily concerned with the

BLM "cancel[ing] lease sales . . . for criteria other than lack of eligible parcels." Id.

at 422, 437 ("I think we'd be asking for . . . a declaration that canceling or deferring

8

lease sales in a manner that would keep the lease sales from happening less than quarterly, for reasons other than a lack of eligible parcels, is illegal."). The WEA also claimed that it was not arguing the Leasing Reform Policy violates the MLA. Id. at 435. But the WEA asserted that, if the district court concluded that the Leasing Reform Policy violated the MLA, then the district court should direct the BLM to invalidate the Policy. Id. at 435 ("[T]o the extent the Court agrees that certain provisions are inconsistent with the controlling statutory authority, that it issue an order to BLM . . . to revise its documents for consistency with controlling statutory law."). The WEA argued that the conservation groups should only be allowed to intervene if and when the BLM actually began changing policy documents. Id. at 421.

The district court found WEA's arguments persuasive, and on January 13, 2017, denied the conservation groups' motion to intervene. The court concluded that two of the four intervention-as-of-right factors had been met: the motion to intervene was timely, App. at 348–49, and the conservation groups had a legally protectable environmental interest in the lawsuit, i.e., their interest in protecting public lands from the impacts of oil and gas drilling. Id. at 349. However, the district court determined that the lawsuit would not impair the conservation groups' interests, id. at 351, and further that the BLM could adequately represent the conservation groups' interests. Id. at 357–60. The conservation groups timely appeal.

*Intervention as of Right*

We review the denial of a motion to intervene as of right de novo. United States v. Albert Inv. Co., 585 F.3d 1386, 1390 (10th Cir. 2009). After conducting that review, we conclude the district court erred in denying the conservation groups' motion to intervene.

*Federal Rule of Civil Procedure 24(a)*

Federal Rule of Civil Procedure 24(a) states non-parties may intervene in a pending action as of right if: "(1) the application is timely; (2) the applicant[s] claim[ ] an interest relating to the property or transaction which is the subject of the action; (3) the applicant[s'] interest may as a practical matter be impaired or impeded; and (4) the applicant[s'] interest is [not] adequately represented by existing parties." Id. at 1391 (citation omitted). This court has historically taken a "liberal" approach to intervention and thus favors the granting of motions to intervene. See, e.g., Coal. of Ariz./N.M. Ctys. for Stable Econ. Growth v. Dep't of Interior, 100 F.3d 837, 841 (10th Cir. 1996).

*Timeliness*

First, we consider whether the present motion to intervene was timely. The timeliness of the conservation groups' motion was rightfully not in dispute.

We determine timeliness "in light of all of the circumstances." Okla. ex rel. Edmondson v. Tyson Foods, Inc., 619 F.3d 1223, 1232 (10th Cir. 2010). But three non-exhaustive factors are "particularly important: (1) the length of time since the

10

movants knew of their interests in the case; (2) prejudice to the existing parties; and (3) prejudice to the movants." Id. (citation omitted). Here, the conservation groups moved to intervene just over two months after the WEA filed the complaint. Given how early in the lawsuit the groups moved to intervene, and, as a result, the lack of prejudice to the WEA, we agree with the district court's determination that the motion was timely. See Utah Ass'n of Ctys. v. Clinton, 255 F.3d 1246, 1251 (10th Cir. 2001) (considering "the relatively early stage of the litigation and the lack of prejudice to plaintiffs flowing from the length of time between the initiation of the proceedings and the motion to intervene").

*Interest in the Subject of the Lawsuit*

Second, we conclude that the conservation groups have two interests which are the subject of this lawsuit. "Whether . . . applicant[s] ha[ve] an interest sufficient to warrant intervention as a matter of right is a highly fact-specific determination." Coal. of Ariz./New Mexico Ctys. for Stable Econ. Growth, 100 F.3d 837, 841 (10th Cir. 1996). A protectable interest is one that "would be 'impeded by the disposition of the action.'" San Juan Cty., Utah v. United States, 503 F.3d 1163, 1203 (10th Cir. 2007) (en banc), abrogated on other grounds by Hollingsworth v. Perry, 133 S. Ct. 2652, 2659–65 (2013) (quoting Allard v. Frizzell, 536 F.2d 1332, 1334 (10th Cir. 1976) (per curiam)).

Contrary to our dissenting colleague's statements, the conservation groups have been constant in their assertion of two protectable interests: (i) obviating and/or minimizing the environmental impact of oil and gas development on public lands;

11

and (ii) preserving the reforms they had worked to implement, including the Leasing Reform Policy. The conservation groups have not abandoned these interests, nor have they "belatedly" claimed other protectable interests not previously asserted.

"With respect to Rule 24(a)(2), we have declared it indisputable that a prospective intervenor's environmental concern is a legally protectable interest." WildEarth Guardians v. Nat'l Park Serv., 604 F.3d 1192, 1198 (10th Cir. 2010) (citation omitted). For instance, in Coalition of Arizona/New Mexico Counties, we held that the movant's record of involvement with an animal species whose "endangered" status was contested, "and his persistent record of advocacy for its protection[,] amount[ed] to a direct and substantial interest in the listing of the [animal] for the purpose of intervention as of right." 100 F.3d at 841.

The conservation groups, likewise, have a "record of advocacy" for the protection of public lands and a demonstrated concern for the damage to public lands caused by oil and gas development. See id. The conservation groups have worked to prevent development of sensitive areas for oil and gas drilling. Where development does take place, the conservation groups have also worked to limit the resulting negative impact on the climate and the harm to the surrounding terrain. Obviously, the conservation groups' environmental interests are front and center when the WEA seeks judicial intervention to alter the BLM's leasing practices with the stated goal of increasing oil and gas development on public lands. The conservation groups' interests in reducing the instances and effects of oil and gas drilling on public lands alone would satisfy the second factor of Federal Rule of Civil Procedure 24(a).

12

But here the conservation groups have an additional interest which also supports their motion to intervene. The conservation groups also have an interest in preserving the Leasing Reform Policy that they spent years negotiating and litigating. The WEA argued before the district court that its lawsuit did not implicate the continued vitality of the Leasing Reform Policy, while the conservation groups read the WEA's complaint as specifically targeting the Leasing Reform Policy by seeking to "revise or rescind" it. App. at 344, 346. The district court concluded that the WEA "seeks to require [the] BLM to hold lease sales where eligible lands are available; that is, to comply with the" MLA and with its own Leasing Reform Policy. Id. at 346. And, in "seek[ing] to hold [the] BLM to those [Leasing Reform Policy] provisions which track" its obligations under the MLA, the court determined that the WEA is not "attempt[ing] to set aside or modify the" Policy, nor is the WEA challenging it. Id. at 347.

In reaching this conclusion, the district court overlooked two key points. The first is *how* the BLM is to achieve the increased frequency of lease sales. The MLA mandates that lease sales take place four times a year when eligible lands are available. The Leasing Reform Policy, consistent with the MLA, requires the same. However, the Leasing Reform Policy also requires that State Offices conduct lease sales on a rotational basis. The WEA's complaint vividly outlines a number of instances where it contends compliance with the Leasing Reform Policy has caused the BLM to fall short of holding quarterly lease sales. If the BLM's current procedures, including those dictated by the Leasing Reform Policy, serve as a

13

roadblock in achieving quarterly lease sales, the BLM will presumably have to abandon both its existing procedures and underlying policies.

The second point overlooked by the district court is that the complaint, which has not been amended, frames the issues before the court. And, among other relief requested in the complaint, the WEA explicitly asks the district court to "[d]irect [the] BLM to revise or rescind all agency guidance and instructional memoranda, including [the Leasing Reform Policy,] I.M. No. 2010-117, that direct implementation of [the] BLM's lease sale program in a manner contrary to law." App. at 42.

The WEA argued at the hearing on the motion to intervene that it was not really "seeking any revisions of the Leasing Reform Policy," and that the requested relief in paragraph 4 "was 'cosmetic' in nature and was not part of any stated claim." Id. at 347. However, the WEA continued, stating that it included this language "in the event the Court found any" of the Leasing Reform Policy's provisions inconsistent with the MLA. In that circumstance, the WEA argued that "the Court may find it appropriate to 'revise or rescind'" the Policy. Id. These two statements stand in direct contradiction of one another—the WEA's first statement, that it is not seeking to revise the Leasing Reform Policy, does not square with its second

14

assertion, that if the Policy violates the MLA, the BLM should be required to "revise or rescind it."[3]

In response to the WEA's remarks, the district court noted that it "accepts" the WEA's representations and will "hold" it "to those representations." Id. at 348. The district court subsequently re-characterized the relief sought by the WEA as "a declaration that [the] BLM's practice of canceling or deferring lease sales less frequently than quarterly, for reasons other than lack of eligible parcels, is illegal under the" MLA. Id. While the district court later repeatedly indicated that the WEA is not seeking to strike down the BLM's Leasing Reform Policy, purportedly clarifying the issues before it, the court's order did not grant an amendment to WEA's complaint or in any way alter the allegations made therein, or limit the relief sought. And, even assuming that the district court did somehow limit the relief that the WEA may seek, the court has restricted WEA's relief to a declaration that the BLM has violated the MLA by holding fewer than quarterly lease sales. This conclusion, then, circles back to the dilemma we have already articulated: How will

---

[3] The WEA is using word games, which the dissent accepts. For example, the dissent states that the WEA is not seeking to challenge or limit the BLM's discretion to determine when eligible lands are available for leasing. Dissent at 2. But that is incorrect, as the WEA confirmed at oral argument. At oral argument, the WEA acknowledged that it has continued to "vehemently object" to the BLM's current method of applying the Leasing Reform Policy and lease rotation policy. Oral Arg. at 15:55–17:23. As the WEA reiterated in its appellate brief and at oral argument, the WEA is continuing to challenge the very policies that the conservation groups are trying to defend.

15

the BLM achieve four lease sales a year?  Possibly as suggested by WEA, by "revising or rescinding" the Leasing Reform Policy.

As made clear by the allegations in the complaint, the central issue in this case goes beyond the question of whether the BLM has violated the MLA by failing to hold quarterly lease sales.  WEA also seeks to alter or rescind the Leasing Reform Policy to improve the likelihood of more frequent lease sales.  We conclude that the conservation groups not only have an environmental interest in the lawsuit, but also an interest in preserving the Leasing Reform Policy that they worked to develop and implement.

*Interest may be Impaired or Impeded*

Third, we consider whether the conservation groups' interests may be impaired or impeded by the pending litigation, and we conclude that they may.  This element "presents a minimal burden."  WildEarth Guardians, 604 F.3d at 1199.  We require the movants to show it is "possible" that the interests they identify will be impaired. Id.; Clinton, 255 F.3d at 1253.  This factor is met in environmental cases where the district court's decision would require the federal agency to engage in an additional round of administrative planning and decision-making that itself might harm the movants' interests, even if they could participate in the subsequent decision-making. WildEarth Guardians, 604 F.3d at 1199.

For example, in a case challenging a Presidential Proclamation establishing the Grand Staircase-Escalante National Monument, we reversed the denial of a motion to intervene filed by various environmental groups and businesses.  Clinton, 255 F.3d at

16

1256. The district court had denied intervention because it determined that the only question before it was whether the executive action violated various statutes. Id. at 1249. This question, the district court concluded, did not implicate the movants' interests in the continued existence of the monument. Id. at 1252. We disagreed and held impairment was possible because if the area lost its monument designation it would suffer environmental degradation, just as it had before its designation. Id. at 1253.

In Clinton, we also rejected plaintiff-appellees' argument that, if intervention were permitted at all, belated intervention would suffice. Plaintiff-appellees argued that "even if the monument management plan were set aside, pre-existing land use plans would have to be revised, providing the intervenors with an opportunity to protect their interests in those proceedings." Id. As we explained, "'[w]here a proposed intervenor's interest will be prejudiced if it does not participate in the main action, the mere availability of alternative forums is not sufficient to justify denial of a motion to intervene.'" Id. at 1254 (quoting Commodity Futures Trading Comm'n v. Heritage Capital Advisory Servs., 736 F.2d 384, 387 (7th Cir. 1984)).

Here, if the district court finds that the BLM's current leasing procedures violate the MLA, then the agency will need to change its practices to bring them into compliance with the statute. Should the BLM be required to change its practices, the existing policies that dictate its practices, including the Leasing Reform Policy, will

17

also have to be amended. Should this occur, the conservation groups' interests may be impaired or impeded.[4]

*Adequate Representation*

Finally, we conclude that the presently named parties cannot adequately represent the conservation groups' interests. "[T]he burden to satisfy this condition is 'minimal,' and that '[t]he possibility of divergence of interest need not be great in order to satisfy the burden of the applicants.'" WildEarth Guardians v. United States Forest Serv., 573 F.3d 992, 996 (10th Cir. 2009) (quoting Coal. of Ariz./N.M. Ctys., 100 F.3d at 844–45).

Even if the government is required to represent the interest of the public, a public entity may still intervene:

> [T]he government's representation of the public interest generally cannot be assumed to be identical to the individual parochial interest of a particular member of the public merely because both entities occupy the same posture in the litigation. In litigating on behalf of the general public, the government is obligated to consider a broad spectrum of views, many of which may conflict with the particular interest of the would-be intervenor . . . . This potential conflict exists even when the government is called upon to defend against a claim which the would-be intervenor also wishes to contest.

Clinton, 255 F.3d at 1255–56. Also, we have held that the government cannot adequately represent the interests of a private intervenor *and* the interests of the public. U.S. Forest Serv., 573 F.3d at 996–97 (emphasis added). Moreover, we do

---

[4] Interestingly, the dissent appears to concede that the WEA's request to revise or rescind the Leasing Reform Policy would justify intervention by the conservation groups if it remained as an issue. Dissent at 2. It is apparent from review of the WEA's complaint and the lack of any final judgment denying this claim, it remains an issue.

18

not assume that the government agency's position will stay "static or unaffected by unanticipated policy shifts."  Clinton, 255 F.3d at 1256; see U.S. Forest Serv., 573 F.3d at 997.  If the agency and the intervenors would only be aligned if the district court ruled in a particular way, then a possibility of inadequate representation exists. N.M. Off-Highway Vehicle All. v. United States Forest Serv., 540 F. App'x 877, 881–82 (10th Cir. 2013) (unpublished opinion).

The conservation groups cite cases suggesting that if the government is required to consider both public and private interests, then it is impossible for it to adequately represent the public interest.  See, e.g., WildEarth Guardians, 604 F.3d at 1200; Aplt. Br. at 34.  WEA argues that these cases do not apply where the government is "pursuing a single objective," such as here, where the BLM is asserting its compliance with the MLA.  Aplee. Br. at 25 (quoting San Juan Cty., 503 F.3d at 1204).

We have held that if a case presents only a single issue on which the agency's position is quite clear, and no evidence suggests that position might be subject to change in the future, then representation may be adequate.  Kane Cty., Utah v. United States, 597 F.3d 1129, 1134–35 (10th Cir. 2010).  For example, in Kane County, we held that intervention was unsupported because the only issue in that case was whether the defendant federal government or the plaintiff county held title to rights of way over federal land, and the movants did not claim to have unique knowledge or experience that would assist the BLM in defense of its title.  Id.  However, where there is evidence that the government has multiple objectives, we have declined to

19

find that it could adequately represent intervenors' interests. See, e.g., U.S. Forest Serv., 573 F.3d at 997. For instance, where environmental groups sued the United States Forest Service for approving a methane gas venting plan for an underground mine, we determined that the agency "has multiple objectives" and would need to consider multiple interests before moving forward; thus, its future position was unclear. Id. The BLM "has multiple objectives" in managing oil and gas leasing, as under the multiple-use mandate, it is required to balance wide-ranging and often conflicting interests. See 43 U.S.C. § 1702(c); Norton, 542 U.S. at 58 (requiring the BLM to apply multiple use management, through which it should "strik[e] a balance among the many competing uses to which land can be put, 'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values'").

In its denial of the motion to intervene, the district court noted the conservation groups were seeking "to prevent any tampering to the Leasing Reform Policy, and to safeguard [the] BLM's discretion over the environmental review process for federal land parcels" and the determination of "which parcels become 'eligible' for lease sales." App. at 358. It concluded that the "BLM would certainly be expected to share that position." Id.

However, the change in the Administration raises "the possibility of divergence of interest" or a "shift" during litigation. See, e.g., U.S. Forest Serv., 573 F.3d at 996–97 (quotation omitted). This possibility has already manifested itself in other arenas. For example, in State of Wyoming, et al. v. Zinke, et al., ___ F.3d ___,

20

Nos. 16-8068, 16-8069, 2017 WL 4173619 (10th Cir. 2017), the BLM found itself in the difficult position of filing an appeal to challenge a district court's invalidation of its hydraulic fracturing regulation, only later to ask this court to withhold ruling on its appeal pending final resolution of the BLM's action to rescind the very regulation it had initially sought to uphold and enforce. That same risk of a "shift" in policy exists here.

The conservation groups have specifically identified Executive Orders signed by President Trump which have directed the review of agency regulations that potentially burden the development of oil and gas resources. See Exec. Order No. 13,771 § 2(c), (d) (contemplating that agencies will "eliminat[e] existing costs associated with prior regulations"); see also Exec. Order No. 13,783 § 2(a) ("The heads of agencies shall review all existing regulations, orders, *guidance documents, policies*, and any other similar agency actions . . . that potentially burden the development or use of domestically produced energy resources, with particular attention to oil, natural gas, coal, and nuclear energy resources.") (emphasis added). These Executive Orders have created the opportunity for the BLM to conduct a review that could result in its abandonment of the Leasing Reform Policy. In the face of these Executive Orders, we conclude that the interests and policy goals of the BLM and the conservation groups will possibly diverge. As a result, we determine that the BLM cannot adequately represent the conservation groups' interests.

21

Thus, for the foregoing reasons, we conclude that the conservation groups should be allowed to intervene in the lawsuit as a matter of right. Given this conclusion, we need not address the question of permissive intervention.

## III.

We REVERSE and REMAND to the district court with instructions to allow the conservation groups to intervene as of right under Federal Rule of Civil Procedure 24(a).

17-2005 – *Western Energy Alliance v. Zinke*

**HARTZ,** Circuit Judge, dissenting:

I fail to understand the reasoning of the majority opinion.  The district court's decision to deny the conservation groups' motion to intervene is unassailable.  In accordance with concessions made by the plaintiff WEA (and after stating that it would hold WEA to those concessions), the court determined that none of the interests expressed by the conservation groups was still at risk in the litigation, so they had no right to intervene.  But rather than acknowledging the conservation groups' victory in eliminating most of WEA's claims, the majority opinion reinstates some of those claims, permitting the conservation groups to participate in litigating issues on which its views had already prevailed.  To be sure, even after WEA's concessions there remain some issues before the district court; but the conservation groups never suggested in district court that they had a protected interest in the resolution of those issues.

My view is essentially that presented by the government in its amicus brief on appeal:  Under the claims pleaded and relief sought in WEA's complaint (which, among other things, appeared to challenge the BLM's Leasing Reform Policy) the conservation groups had a right to intervene in the case.  But by the time of the hearing on the conservation groups' motion to intervene, the issues had been greatly narrowed.  The district court stated unequivocally that the Leasing Reform Policy was no longer in play:  "After hearing from the parties and reviewing the Complaint and other pleadings filed in this case, the Court is convinced that this case is not an attempt to set aside or modify the Leasing Reform Policy, nor is it a challenge to the Leasing Reform Policy."  Aplt App.

Vol. III at 347. The court explained that WEA "simply seeks to hold BLM to those provisions which track BLM's obligations under the Mineral Leasing Act." *Id.* It added that WEA also "does not challenge BLM's discretion to determine when and how land parcels became 'eligible' or BLM's right to withhold parcels, or BLM's discretion to determine when further environmental analysis is necessary for any parcel of land." *Id.* at 347 (footnote omitted). As a result, it said, "while quarterly lease sales of 'eligible' lands are mandatory under the Mineral Leasing Act, BLM still has complete discretion to decide *which* parcels are offered for lease sale to oil companies." *Id.* In other words, WEA did not seek to challenge, or to limit, BLM's discretion to determine when eligible lands are available for leasing. The only issue remaining in the case was whether BLM is refusing to conduct the statutorily required quarterly lease sales of eligible land determined to be available for leasing. The district court declared that WEA's concessions would be binding: "The Court accepts the representations of [WEA]'s counsel and will hold [WEA] to those representations." *Id.* at 348.

In light of that pronouncement by the district court, I am puzzled by the majority opinion's statement that rescission or revision of the Leasing Reform Policy "remains an issue." Maj. Op. at 18 n.4. When did we start ignoring rulings of the district court?[1]

---

[1] Footnote 3 of the majority opinion relies on an exchange during oral argument as showing that WEA was "vehemently object[ing]" to the Leasing Reform Policy. Counsel for WEA did indeed respond "That's correct, Judge" to a relatively long question that included the language "vehemently object." It appears, however, that counsel probably understood the question to be asking the opposite of what it actually asked. For the next seven minutes counsel made clear that he was challenging only application of the Mineral Leasing Act, not the Leasing Reform Policy. And he explicitly stated that the lawsuit does not challenge BLM's determination of what lands are eligible and available for

2

Given this narrowing of the issues, the district court turned to an examination of the interests identified by the conservation groups to determine whether they could still justify intervention. The opening paragraph of their motion to intervene states that they "request intervention because [WEA] seeks relief that would harm their interests by eliminating important environmental protections on public lands, and by pursuing a declaratory ruling that could fundamentally change the federal oil and gas leasing program." Aplt. App. Vol. I at 44–45. The motion then identified the two forms of relief sought by WEA to which the conservation groups objected: "First, WEA challenges [the Leasing Reform Policy]." *Id.* at 45. "Second, WEA seeks a far-reaching ruling that BLM <u>must</u> offer oil and gas leases for sale every three months wherever a company expresses interest in leasing public lands." *Id.* In my view, those interests would justify intervention under a reasonable reading of the complaint. But the district court correctly determined that those interests are not threatened by the sole relief that the court would allow WEA to pursue: compelling compliance with the statutory requirement that the BLM conduct quarterly lease sales for eligible parcels deemed by the BLM to be available for leasing.

On appeal the conservation groups have utterly failed to identify an interest (certainly not a protected interest) raised in the district court that is threatened by what is left of this litigation. Articulating an interest now is too late. The district court had to rule on what was before it at the time of the ruling. Of course, affirming the district court

leasing. The footnote also asserts that WEA's brief on appeal raises these issues; but I cannot find support for that assertion. In any event, it does not matter what counsel said in a brief or oral argument, because the district court had taken these issues off the table.

3

would not preclude a future motion to intervene by the conservation groups if they believe they have the necessary interest in the remaining issues being litigated.

       I respectfully dissent.